**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **J & J SPORTS PRODUCTIONS, INC.,** | **08-CV-00486-OWW-DLB** |
| **Plaintiff,** | **MEMORANDUM DECISION RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION** |
| **v.** | |
| **FRANKIE JO PHELAN, INDIVIDUALLY and d/b/a FRANKIE'S,** | |
| **Defendant.** | |

**I.  INTRODUCTION**

Before the court are cross-motions for summary judgment or, in the alternative, summary adjudication brought by Plaintiff J & J Sports Productions, Inc. ("Plaintiff") and Defendant Frankie Jo Phelan ("Defendant").  Both motions are opposed.  The following background facts are taken from the parties' submissions in connection with the motions and other documents on file in this case.[1]

**II.  BACKGROUND**

**A.   The Boxing Program**

This case concerns the Super Featherweight Championship Fight between boxers Marco Antonio Barrera and Mzonke Fana televised on April 9, 2005 (the "Boxing Program").  Plaintiff is a closed-

---

[1]  "A district court does not, of course, make 'findings of fact' in ruling on a summary judgment motion. Findings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations." *Rand v. Rowland*, 154 F.3d 952, 957 n.4 (9th Cir. 1998); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) ("As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury . . . ."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

1

circuit distributor of sports and entertainment programming. Defendant is an individual resident of the Eastern District of California who formerly owned and operated "Frankie's," a neighborhood bar located in Madera, California.

Defendant was the lawful operator of Frankie's on the date of the fight and had a commercial cable account with Comcast. (Doc. 29-2 at 2; Doc. 32 at 3.)  Defendant purchased the Boxing Program from Comcast for $39.99. (Doc. 29-2 at 2.)  On April 9, 2005, Comcast provided the signal for the Boxing Progam and Defendant aired the fight at Frankie's. (*Id.*)  Patrons of Frankie's watched the Boxing Program.  Apparently, a private investigator hired by Plaintiff also watched the Boxing Program at Frankie's.

Prior to the fight, Plaintiff and Golden Boy Productions, Inc. ("Golden Boy") entered into a "Closed Circuit Television License Agreement" pursuant to which Plaintiff obtained "the exclusive license to exhibit," at "commercial closed-circuit television exhibition outlets," Golden Boy's "live telecast" of the Boxing Program.  The License Agreement reads:

> GOLDEN BOY PROMOTIONS, INC. (referred to herein as 'Promoter') hereby grants to J&J Sports Productions, Inc[.] ('J&J' or 'you' or 'Licensee') the exclusive license to exhibit, only within the fifty states of the United States of America and the Commonwealth of Puerto Rico (the 'Territory'), Promoter's live telecast of the [Boxing Program], *only at commercial closed-circuit television exhibition outlets*, such as theaters, bars, clubs, lounges, restaurants and the like, each with a fire code occupancy not to exceed 500 persons per outlet (except for casinos), located within the Territory.  The exhibition rights granted herein do not include any rights in Mexico or Canada, or transmissions to hotel guest rooms, in-flight aircraft or other transportation facilities.

(Doc. 16-2, Ex. 1 at 1.)

The License Agreement permitted Plaintiff to sublicense exhibition

2

rights to *commercial* closed-circuit television outlets.   By contrast, the License Agreement contains a section on "Pay-Per-View Exhibitions" which specifies that *Golden Boy*, not Plaintiff, "shall license the live cable television and direct broadcast satellite television exhibition of the" Boxing Program "on a *residential* pay-per-per-view" basis and that Plaintiff "shall have no interest or participation in such [residential] pay-per-view exhibition." (*Id.* at 4 (emphasis added).)

B.   <u>Plaintiff's Lawsuit</u>

On March 8, 2008, Plaintiff filed a three-count complaint against Defendant individually and doing business as Frankie's. The first count alleges a violation of 47 U.S.C. § 605, the second count alleges a violation of 47 U.S.C. § 553, and the third count alleges a claim for conversion under California law.

Plaintiff asserts that Defendant needed to purchase a sublicense from Plaintiff to lawfully obtain and exhibit the Boxing Program at Frankie's.   Plaintiff contends that Defendant's purchase of the Boxing Program from Comcast is not dispositive.   According to Plaintiff, Defendant paid the "residential" pay-per-view fee ($39.99) for the Boxing Program, not the applicable sublicense fee for exhibition at commercial establishments.

C.   <u>The Cross-Motions</u>

Plaintiff moves for summary judgment on its § 553 claim. Plaintiff does not move for summary judgment on its § 605 or conversion claim. (*See* Doc. 16-2 at 2, 4-6.)   Defendant moves for summary judgment on all Plaintiff's claims.

III.   SUMMARY JUDGMENT/ADJUDICATION STANDARD

A party may move for summary judgment "on all or part of a

3

claim." Fed. R. Civ. P. 56 (a) & (b).   "The standards and procedures for granting partial summary judgment, also known as summary adjudication, are the same as those for summary judgment." *Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).   Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on a claim as to which it will have the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted); *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 617 (2d Cir. 1998) (noting that where the moving party will bear the burden of proof, "its own submissions in support of the motion must entitle it to judgment as a matter of law").   With respect to an issue as to which the non-moving party

**4**

will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun,* 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.* Likewise, "[a] non-movant's bald assertions or a mere scintilla of evidence in his [or her] favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

"[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). And simply because the parties present cross-motions for summary judgment on a claim does not mean that

there must be a winner:

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (internal citation omitted).

## IV.   DISCUSSION AND ANALYSIS

**A.   Preliminary Matters**

   **1.   Defendant's Untimely Opposition**

   With respect to Plaintiff's motion for summary judgment/adjudication, in Plaintiff's reply brief, Plaintiff objects to Defendant's opposition brief as untimely and requests that Defendant not be permitted to oppose the motion at oral argument. *See* Local Rule 78-230(c) ("No party will be entitled to be heard in opposition to a motion at oral arguments if opposition to the motion has not been timely filed by that party."). Plaintiff's motion for summary judgment/adjudication was filed on July 30, 2009, and the hearing on the motion was set for October 26, 2009.

   According to Local Rule 78-230(c), Defendant's opposition to Plaintiff's motion was due not less than "fourteen (14) days" preceding the noticed hearing date.  Fourteen days prior to the noticed hearing date, October 26, 2009, is Monday October 12, 2009, Columbus day, which is a legal holiday.  Under Rule 6(a)(3), when the last day of a period falls on a legal holiday, "the period runs

6

until the end of the next day that is not a Saturday, Sunday, [or] legal holiday." *See also* Local Rule 6-136. Accordingly, Plaintiff's opposition was due the Friday before Columbus day, October 9, 2009. Defendant's opposition was filed on October 16, 2009. Defendant concedes it was untimely filed.[2] Defendant's late opposition does not, however, end the inquiry.

Plaintiff raised the argument about Defendant's late opposition in Plaintiff's reply brief. As it turns out, Plaintiff's reply brief was untimely filed. According to Local Rule 78-230(d), a reply "to any opposition" is due not less than "five (5) *court* days preceding the date of hearing." (Emphasis added.) Five court days prior to the hearing date, October 26, 2009, is October 19, 2009. Plaintiff's reply brief was filed on October 21, 2009, *past* the deadline.

The time infractions committed by both sides are considered off-setting penalties. Plaintiff's untimely objection to Defendant's untimely opposition is DENIED.

B.   Substantive Claims

      1.   Claim For Violation Of 47 U.S.C. § 553

            a.   Plaintiff's Motion

      Plaintiff moves for summary judgment only on its claim under 47 U.S.C. § 553.[3]   Plaintiff argues that it has shown "by a

_____

[2] Defendant's counsel, Kristen Gates, has submitted a declaration acknowledging the opposition "was untimely" and stating that she "inadvertently [] mis-calendared the deadline in which to file the opposition, and did not realize this until the filing of Plaintiff's reply." (Gates Decl. ¶ 3.)

[3] *Defendant* moved for summary judgment on *all* Plaintiff's claims, and Plaintiff opposes Defendant's motion as to all claims.

7

preponderance of evidence that Defendant violated" 47 U.S.C. § 553. This section deals with cable communications.  Section 553(a)(1)-(2) provides:

> (a) Unauthorized interception or receipt or assistance in intercepting or receiving service; 'assist in intercepting or receiving' defined
>
> (1) No person shall *intercept or receive* or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
>
> (2) For the purpose of this section, the term 'assist in intercepting or receiving' shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

(Emphasis added.)  The statute creates a private right of action for "[a]ny person aggrieved by any violation of subsection (a)(1)." § 553(c)(1).

Among other forms of relief, in a § 553 case, the private plaintiff may obtain damages, costs and attorney's fees. *See* § 553(c)(2)(B)-(C).  Section 553(c)(3)(A)-(C) explains the extent of recoverable damages and the judge's discretion in calculating damages:

> (3)(A) Damages awarded by any court under this section shall be computed in accordance with either of the following clauses:
>
> (i) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the

---

However, Plaintiff's own motion for summary judgment addresses only one claim, i.e., Plaintiff's claim under § 553. (*See* Doc. 16-2.)

8

violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or

(ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just.

(B)  In any case in which the court finds that the violation was *committed willfully and for purposes of commercial advantage or private financial gain*, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000.

(C) In any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $100.

(Emphasis added.)  Plaintiff claims that, without authorization, Defendant intercepted and/or received the Boxing Program in violation of 47 U.S.C. § 553(a)(1).  Plaintiff seeks increased damages under § 553(c)(3)(B) claiming that Defendant's violation was committed "willfully and for purposes of commercial advantage or private financial gain."  Under § 553, whether a violation was committed at all, which gives rise to liability, and whether that violation was committed "willfully and for purposes of commercial advantage or private financial gain," which gives rise to enhanced damages, are two separate issues.

i.   Violation Of § 553(a)(1)

A violation of § 553(a)(1) has three elements.  It must be shown: (i) that Defendant intercepted or received or assisted in intercepting or receiving; (ii) a communications service offered over a cable system; and (iii) that Defendant was not specifically authorized to do so by a cable operator or otherwise specifically

9

authorized to do so by law.  The heart of the dispute between the parties is the last element, i.e., whether Defendant was authorized to receive the Boxing Program.

Defendant takes the position that because it paid for and Comcast authorized Defendant's reception of the Boxing Program, Defendant did not, and could not have, violated § 553.  The Comcast Cable account statement for "Frankie's" reflects a charge of $39.99 on "04/09" for "Barrera Vs Fana."

Plaintiff argues that Defendant misses the point.  The consent to receive the signal of the Boxing Program in a commercial establishment "was not Comcast's to give. Comcast had the right to distribute the [Boxing Program] to residential customers; [Plaintiff] had the right to distribute the [Boxing Program] to commercial establishments." (Doc. 29-1 at 3.) Plaintiff further argues that Defendant paid the "residential fee" not the commercial fee, which, at a minimum, was $800.00.

The major disconnect between the parties on this claim is whether, for purposes of § 553(a)(1), Comcast could have authorized Defendant to receive the Boxing Program at Frankie's.  Neither party cites any case law with respect to this claim.

There is no dispute that Defendant did not obtain a license from Plaintiff to receive the signal for the Boxing Program at Frankie's. (Doc. 16-2, **Ex.** 5 at 1, 3; Doc. 23-3, **Ex. E** at 1, 3.) There is also no dispute that Defendant purchased the Boxing Program from Comcast. (Doc. 29-2 at 2.)  However, despite Defendant's purchase of the Boxing Program from Comcast, if Plaintiff had the exclusive right to license the transmission of the Boxing Program to *commercial establishments* such as Frankie's,

and if Comcast did not acquire the right or have permission to do so, then Comcast could not have authorized Defendant's reception of the Boxing Program at Frankie's under § 553.  As explained in *National Satellite Sports, Inc. v. Time Warner Entertainment Co.*, 217 F. Supp. 2d 466, 468 (S.D.N.Y. 2002) (internal citation omitted), while a cable operator may have the right to transmit a program and "authorize" its reception at a residence, that same cable operator may lack the authority to transmit the same program and "authorize" its reception at a commercial establishment:

> Time Warner also contends that the plaintiff's § 553 claims should be dismissed because § 553(a)(1) only bars a person from such interception of signals as is not 'specifically authorized ... by a cable operator, and the complaints here allege that Time Warner, a cable operator, authorized, albeit improperly, the cable transmissions of the fight to commercial establishments. But such an argument fails to make the obvious distinction between a lawful authorization blessed by the statute and the wholly unlawful authorization here alleged. For a cable operator lawfully permitted to broadcast a fight to residential customers to allow its services to be used to permit commercial establishments to tap-in to the broadcast without paying the party that holds the exclusive right to broadcast the fight commercially is not an authorization a cable operator can give, under § 553 or otherwise.

Defendant's argument that it purchased the Boxing Program from Comcast is not dispositive.  It does not preclude Plaintiff from demonstrating that Defendant was not authorized by Comcast to receive the Boxing Program under § 553.  Plaintiff, however, has not sufficiently demonstrated the necessary facts to establish Plaintiff's entitlement to judgment as a matter of law.

As a threshold matter, Plaintiff contends that it had exclusive rights to license the transmission of the Boxing Program to commercial establishments.  In support of this fact, Plaintiff points to its contract with Golden Boy.  While it is true that

11

Golden Boy gave Plaintiff "the exclusive license to exhibit" *Golden Boy's* "live telecast" of the Boxing Program at commercial establishments, Plaintiff has not shown that no other entity besides Golden Boy had the right to telecast the Boxing Program. If Golden Boy was not itself the "exclusive" holder of the telecasting rights, or not the only lawful telecaster of the fight, then it leaves open that Comcast could have acquired the right or permission to transmit the Boxing Program to commercial establishments from some source other than Plaintiff.

Second, assuming Golden Boy had the exclusive right to telecast the fight and, in turn, granted Plaintiff the exclusive right to license the transmission of the Boxing Program to commercial establishments, Plaintiff still has not provided *evidence* to affirmatively demonstrate that Defendant had no right to receive the Boxing Program at Frankie's from Comcast. Plaintiff's evidence does not rule out the possibility that Comcast could have authorized the transmission of the Boxing Program to Frankie's so long as Defendant paid $39.99.

Plaintiff *argues* that the minimum fee it charged commercial establishments to obtain the Boxing Program was $800.00 (Doc. 29 at 6) well beyond the $39.99 which Defendant paid to Comcast. This discrepancy in price, Plaintiff argues, shows that Defendant failed to pay the requisite fee and therefore could not have lawfully received the signal for the Boxing Program at Frankie's. Plaintiff obtained the $800.00 figure from a "Rate Card" it submitted in support of its motion. This Rate Card contains the *J & J Sports Productions, Inc.* logo at the top, the name of fight (along with another fight: Hernandez v. Montiel), and sets commercial rates

according to seating capacity:

| SEATING | RATE |
|---------|------|
| 1-50 | 800.00 |
| 51-100 | 1200.00 |
| 101-200 | 1800.00 |
| 201-300 | 2200.00 |
| 301-400 | 3300.00 |
| 401-500 | 3500.00 |

Below this, the following text appears:

> This Rate Card is to be use [sic] by all distributors in the U.S [sic] territory for Commercial Establishments.
>
> Any establishments with higher capacity or changes in capacity to be approved by Garden City Boxing Club Inc Sales Manager Art Gallegos or President Joe Gagliardi.[4]

While this Rate Card is some evidence that Plaintiff, at one point, set the minimum price for commercial establishments at $800.00, this Rate Card does not show that Plaintiff actually *charged* that rate to anyone.   Plaintiff's evidentiary showing leaves too much room for doubt to warrant summary judgment.   Plaintiff's evidence does not show that it never set any other fee structure with commercial establishments or cable operators, or never entered into any arrangement with Comcast for the broadcasting of the fight to commercial establishments which would have authorized Comcast to transmit the Boxing Program to Frankie' for $39.99, or that $39.99 was, in fact, the "residential" rate charged by Comcast.   There is no "minimum" fee set forth in the actual License Agreement between Golden Boy and Plaintiff which specifies an exact minimum dollar amount that Plaintiff must charge for a commercial establishment's reception of Golden Boy's telecast.    It is undisputed that Defendant had a commercial account with Comcast, and, viewing the

---

[4] **Plaintiff does not explain its relationship to or with "Garden City Boxing Club Inc."**

13

evidence in a light most favorable to her, it appears that she purchased the Boxing Program on this commercial account.

As the party moving for summary judgment, Plaintiff's evidence leaves too many gaps unfilled and is insufficient to demonstrate, as a matter of law, that Defendant was not authorized to receive the Boxing Program at Frankie's.  Plaintiff's motion for summary judgment as to Defendant's liability under § 553 is DENIED.

### ii. Willfully and for purposes of commercial advantage or private financial gain

Plaintiff is also not entitled to summary judgment on its claim for enhanced statutory damages on the premise that Defendant's "violation" of § 553 was committed "willfully and for purposes of commercial advantage or private financial gain," § 553(c)(3)(B).

For Plaintiff to be entitled to recover increased damages available under § 553(c)(3)(B), there must be an underlying "violation" of § 553.  However, whether Defendant committed a violation of § 553 cannot be determined as a matter of law. Whether Defendant lacked authorization to receive the Boxing Program at Frankie's remains an open issue.

Even assuming, *arguendo*, that Defendant committed a violation of § 553, genuine issues of fact preclude a determination that Defendant's violation was committed willfully.  Although "willfully" is not defined in § 553, the statute has been interpreted to require a "'disregard for the governing statute and an indifference to its requirements.'" *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 948 (8th Cir. 2007) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 127 (1985));

14

*Time Warner Entm't/Advance Newhouse P'ship v. Worldwide Elecs.*, *L.C.*, 50 F. Supp. 2d 1288, 1301 (S.D. Fla. 1999).   This is the generic standard for "willful" conduct as that term is used in civil statutes. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990).   This standard encompasses knowing violations of a statutory requirement, as well as reckless ones. *See Comcast of Ill. X.*, 491 F.3d at 947 (upholding an award of enhanced damages under § 553, stating that the defendants' "actions showed reckless disregard of the statutory requirements"); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (collecting cases, including *Thurston*, and stating "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well").

The statutory provision which permits a court to enhance damages where the violation at issue was committed "willfully and for purposes of commercial advantage or private financial gain," § 553(c)(3)(B), is followed immediately by a statutory provision, § 553(c)(3)(C), which permits the court to reduce the minimum damages down to $100:

> (C) In any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $100.

§ 553 (c)(3)(C).   Reading § 553(c)(3)(B) and (C) together, a violation committed "willfully" under § 553(c)(3)(B) does not include a violation where the "violator was not aware and had no reason to believe that his [or her] acts constituted a violation of this section."   Based on the evidence presented, it is unclear

15

whether Defendant "willfully" committed the purported violation of § 553.  According to Defendant's declaration, she had a "commercial cable account with Comcast Cable" and when she purchased the fight, she "was told by the representative at Comcast that the Program would be billed to [her] commercial account and to change the television channel to a specific channel at the time that Program was to start, and [she] had an employee of [hers] do just that."[5]  Defendant states that she "purchased the Program from Comcast Cable and paid the commercial fee for the same." (Phelan Decl. ¶¶ 1, 6, 11.)

Shortly after the Boxing Program, an attorney for Plaintiff called Defendant and Defendant "explained to him that [Defendant] had purchased the Program through Comcast Cable, gave him the name of the person [Defendant] spoke to, and sent him the documentation of the purchase of the Program."  Defendant had never heard of Plaintiff (J & J Sports Productions, Inc.) before. (*Id.* at ¶ 7.)

It is undisputed that Defendant "did not have a satellite, an illegal black box, or any other hardware or software other than Comcast's basic cable system" and that she purchased the Boxing Program from Comcast Cable. (Doc. 29-2 at 2.)  There is no evidence that Comcast informed Defendant that the commercial rate was something other than $39.99, that Defendant was purchasing only a "residential" pay-per-view match, or expressed something which suggested to Defendant that exhibiting the Boxing Program at Frankie's was improper.

Based on the evidence, Plaintiff has not established, as a

[5] Plaintiff has not filed any evidentiary objections to Defendant's declaration.

matter of law, that Defendant's purported violation of § 553 was committed "willfully."  Plaintiff's motion for summary adjudication on the issue that it is entitled to enhanced statutory damages is DENIED.

At this juncture, whether the violation was committed for "commercial advantage or private financial gain" is premature because Plaintiff has not demonstrated a violation of the statute or its willful nature.  This prevents summary judgment for enhanced damages.

### b.  Defendant's Motion

Defendant moves for summary judgment as to the § 553 claim, arguing that it was "specifically authorized to receive the [Boxing] Program by a cable operator," Comcast. (Doc. 23-1 at 7.) Defendant's argument fails to recognize that while a cable operator may have the right to transmit a program and "authorize" its reception at a residence, that same cable operator may lack the legal authority to transmit the same program and "authorize" its reception at a commercial establishment where patrons will view the broadcast. *Nat'l Satellite Sports, Inc.*, 217 F. Supp. 2d at 468. If Plaintiff had the exclusive right to license the transmission of the Boxing Program to commercial establishments such as Frankie's, and if Comcast had no right or permission to do so, then Comcast lacked the ability to authorize Defendant's reception of the Boxing Program under § 553. *See id.*  Defendant has not shown that Comcast had actual authority to transmit the Boxing Program to a commercial establishment for $39.99.  The fact that Comcast did, in fact, transmit the Boxing Program to Frankie's on the night of the fight does not show that Comcast, in fact, possessed the requisite

17

authority to do so.  Comcast may have believed it was sending the signal to a residential cable box or made a mistake by sending the signal to Frankie's. *See Nat'l Satellite Sports, Inc.*, 217 F. Supp. 2d at 468; *Garden City Boxing Club, Inc. v. Focused Enters., Ltd.*, No. 06-CV-4874 (FB)(RER), 2007 WL 1655647, at *4 (E.D.N.Y. June 06, 2007).[6]  Even if the fact of transmission alone suggests that Comcast was authorized to transmit the signal to Frankie's, Plaintiff's exclusive License Agreement with Golden Boy, and Defendant's failure to purchase a commercial license from Plaintiff, calls into question whether Comcast had the authority, for purposes of § 553, to transmit the signal to Frankie's.

Defendant's motion for summary judgment as to the § 553 claim is DENIED.

### 2.  Claim For Violation Of 47 U.S.C. § 605

Only Defendant moves for summary judgment on Plaintiff's claim under 47 U.S.C. § 605.  In four sentences, § 605(a) lists various types of unauthorized publication or use of electronic communications.  While Plaintiff has not specified which sentence of § 605(a) it is suing under, the parties discuss only the first sentence, which states:

> Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or

---

[6] On the Comcast Cable account statement, the entry for the Boxing Program is dated "04/09" and the associated charge is "39.99." Immediately below this, there is an entry for "05/10 - 06/09," that reads "Commercial B/r Standard" and the associated charge is "$71.00."  From the face of the statement, it is not clear that the "04/09" Boxing Program was purchased during a period in which Defendant had a commercial account, as the $71.00 charge for the "Commercial B/r Standard" is for the "05/10 - 06/09" period which postdates the fight.

**assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof,** *except through authorized channels of transmission or reception*, **(1) to any person other than the addressee, his agent, or attorney . . .**

(Emphasis added.)  In turn, two provision of "chapter 119, Title 18," § 2511(2)(c) and (d), state:

**(c) It shall not be unlawful under this chapter for a person acting** *under color of law* **to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.**

**(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.**

(Emphasis added.)  In her briefing, Defendant cites § 2511(2)(c), not (d).  However, § 2511(2)(c) is inapplicable as there is no indication that anybody in this case was "acting under color of law."  There are no governmental actors involved in this case.  The section which Defendant most likely meant to cite is § 2511(2)(d).

Defendant posits that Comcast gave its "consent" to Defendant's reception of the Boxing Program signal, and this consent means that Defendant's subsequent "divulg[ing] or publish[ing]" of the Boxing Program, by exhibiting it to her patrons, was done "through authorized channels of transmission or reception."  Defendant's argument fails to address Comcast's inability to consent to the transmission of the Boxing Program to commercial establishments.  If Plaintiff had the exclusive right to license the transmission of the Boxing Program to commercial

19

establishments such as Frankie's, and if Comcast did not acquire the right or permission to do so, then Comcast could not have consented to and authorized Defendant's reception of the Boxing Program at Frankie's.   In that case, Defendant's airing of the Boxing Program at Frankie's could not have been "through authorized channels of transmission or reception." *See Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 916 (6th Cir. 2001) (rejecting the argument that because a satellite broadcaster was permitted to transmit a boxing program to residential customers, its transmission to commercial establishments was done "though authorized channels of transmission or reception" under § 605, as the satellite operator "was not authorized to transmit the event to commercial establishments"); *see also Nat'l Satellite Sports, Inc.*, 217 F. Supp. 2d at 469.

Defendant has not shown that Comcast had actual authority to transmit the Boxing Program to a commercial establishment for $39.99.   The mere fact that Comcast did, in fact, transmit the Boxing Program to Frankie's on the night of the fight does not show that Comcast, in fact, possessed the requisite authority to do so. Even if the fact of transmission alone provides some support for the notion that Comcast had the authority to transmit the signal to Frankie's, Plaintiff's exclusive License Agreement with Golden Boy, which purportedly gave it exclusive exhibition rights for commercial establishments, and Defendant's failure to purchase a commercial license from Plaintiff, bear on a genuine issue of fact as to Comcast's authority to transmit the Boxing Program to Frankie's.   In turn, this evidence also calls into question whether Defendant's airing of the Boxing Program was "through authorized

20

channels of transmission or reception." Defendant's motion for summary judgment as to Plaintiff's § 605(a) claim is DENIED.

Although indirectly raised by the briefing, neither party has squarely addressed a threshold issue regarding Defendant's purported liability under § 605(a), i.e., whether the transmission of the Boxing Program from Comcast to Frankie's was a type of "communication" covered by the statute.

While § 605(a) covers airborne communications, including satellite transmissions, *DirecTV, Inc. v Webb*, 545 F.3d 837, 844 (9th Cir. 2008), numerous courts have concluded that § 605(a) does *not* cover cable communications, which, instead, are governed by § 553. *Charter Commc'ns Entm't I, DST v. Burdulis,* 460 F.3d 168, 172-73 (1st Cir. 2006) (concluding that "the statutory text does make clear that § 605 is not to apply to signals delivered by wire over a cable network" and stating "[s]ection 605 deals with communications traveling through the air (via radio), whereas § 553 covers communications traveling over cable wire"); *TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 207 (3rd Cir. 2001) (concluding that "once a satellite transmission reaches a cable system's wire distribution phase, it is subject to § 553 and is no longer within the purview of § 605"); *United States v. Norris*, 88 F.3d 462, 469 (7th Cir. 1996) (concluding that "cable television programming transmitted over a cable network . . . must be prosecuted under § 553(a) and not § 605"). Although the Ninth Circuit has not addressed this issue, several district courts in the Ninth Circuit have concluded that § 605 does not cover cable communications. *See, e.g., J & J Sports Prods., Inc. v. Tsoulouhas*, No. C08-695Z, 2008 WL 5390936, at *1 (W.D. Wash. Dec. 23, 2008); *J & J Sports Prods.,*

1  *Inc., v. Man Thi Doan*, No. C-08-00324 RMW, 2008 WL 4911223, at *2

2  (N.D. Cal. Nov. 13, 2008).  There is some contrary authority. *Int'l*

3  *Cablevision, Inc. v. Sykes*, 75 F.3d 123 (2d Cir. 1996).

4  In her briefing on the § 605(a) claim, Defendant states that

5  she received the Boxing Program from Comcast Cable, a "cable

6  provider." (Doc. 23-1 at 5.)[7] It is an undisputed fact that

7  "Defendant did not have a satellite" and that Defendant possessed

8  only "Comcast's basic cable system." (Doc. 29-2 at 2.)  The

9  undisputed facts call into question whether Defendant received the

10 Boxing Program at Frankie's through a satellite signal or some

11 communication subject to § 605(a).  It appears Defendant received

12 the Boxing Program through a cable network communication covered by

13 § 553, not § 605.  However, because Defendant has not argued this

14 point, it is unnecessary to resolve at this time.

15 Defendant's motion for summary judgment on Plaintiff's §

16 605(a) claim is DENIED.

17 **3.**   **Conversion**

18 Defendant is the only party moving for summary judgment on

19 Plaintiff's conversion claim.  Under California law, "[c]onversion

20 is the wrongful exercise of dominion over the property of another.

21 The elements of a conversion are [1] the plaintiff's ownership or

22 right to possession of the property at the time of the conversion;

23 [2] the defendant's conversion by a wrongful act or disposition of

24 property rights; and [3] damages." *Greka Integrated, Inc. v.*

25 *Lowrey*, 133 Cal. App. 4th 1572, 1581 (2005) (internal quotation

26

27  [7] **Similarly, in her briefing on the § 553 claim, Defendant**

28 **refers to Comcast as a "cable operator." (Doc. 23-1 at 7.)**

marks omitted); *see also G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.,* 958 F.2d 896, 906 (9th Cir. 1992). "Because conversion is a strict liability tort, questions of the defendant's good faith, lack of knowledge, motive, or intent are not relevant." *Gilman v. Dalby*, 176 Cal. App. 4th 606, 615 n.1 (2009).

Defendant argues that Plaintiff failed to provide evidence that Plaintiff had the exclusive ownership of, or the exclusive right to license, the broadcasting of the Boxing Program to commercial establishments, negating the first element of conversion.[8]  Plaintiff has submitted a declaration from Joseph Gagliardi, Plaintiff's President, in which Mr. Gagliardi states that Plaintiff "purchased and retains the exclusive commercial exhibition licensing rights" to the Boxing Program. (Gagliardi Decl. ¶ 3.)  In support of this statement, Mr. Gagliardi refers to the contract he "signed with Golden Boy Promotions, Inc regarding obtaining exclusive distribution rights to the Program," which is "attached as Exhibit '1' to Plaintiff's Memorandum of Points and Authorities." (*Id.* at ¶ 10.)  The copy of Plaintiff's contract with

---

[8]  Defendant does not dispute whether Plaintiff's claimed exclusive ownership of, or exclusive right to license, the broadcast of the Boxing Program to commercial establishments constitutes "property" which can be converted. *See Don King Prods./Kingvision v. Lovato*, 911 F. Supp. 419, 423 (N.D. Cal. 1995) (concluding that exclusive rights to distribute a broadcast signal to commercial establishments constituted a "right to possession of property" for purposes of a conversion claim under California law); *see also DIRECTV, Inc. v. Pahnke*, 405 F. Supp. 2d 1182, 1189 (E.D. Cal. 2005) (concluding that the "right to distribute programming via satellite" constituted a "right to possession of personal property" for purposes of a conversion claim under California law).

Golden Boy, so attached, does, on its face, grants Plaintiff the "exclusive" right to license Golden Boy's telecast of the Boxing Program to commercial establishments.  Defendant has not produced evidence showing that some other entity besides Golden Boy was telecasting the Boxing Program.

The evidence is sufficient to create a triable issue as to whether Plaintiff had the requisite ownership of or right to possess the property at issue.  Defendant's motion for summary adjudication on this ground is DENIED.

Next, Defendant argues that, even if Plaintiff had exclusive ownership of or rights to license the broadcast of the Boxing Program to commercial establishments, Plaintiff has failed to demonstrate Defendant's conversion by a wrongful act or disposition.  Defendant argues that her purchase of the Boxing Program from Comcast, through which she acquired the Boxing Program, does not constitute conversion of the Boxing Program by a wrongful act or disposition, as her purchase was "lawful." Defendant's argument ignores the fact that Comcast may not have had authority to transmit the Boxing Program to a commercial establishment such as Frankie's.  Simply because Defendant purchased the Boxing Program from Comcast does not demonstrate that Defendant's acquisition of the Boxing Program at its commercial establishment was lawful or proper.  Plaintiff's License Agreement with Golden Boy, which purportedly gave it exclusive exhibition rights for commercial establishments, and Defendant's failure to purchase a commercial license from Plaintiff, create a triable issue as to whether Defendant's acquisition of the Boxing Program

**24**

from Comcast for $39.99, for purposes of airing the Boxing Program at Defendant's commercial establishment, was wrongful.

Defendant's motion for summary adjudication on Plaintiff's conversion claim on the ground that Defendant did not convert the Boxing Program by a wrongful act or disposition is DENIED.

## C.    Defendant's Evidentiary Objections

Defendant has submitted written objections to evidence submitted by Plaintiff and matters asserted in Plaintiff's Separate Statement of Undisputed Material Facts.  Plaintiff, in its *untimely* reply brief, objects to Defendant's written objections as untimely. Defendant's written objections are late.   However, because both parties failed to adhere to the deadlines, Plaintiff's untimeliness argument is unpersuasive.   In any event, Defendant's evidentiary objections lack merit or are directed at evidence or statements immaterial to the disposition of the motions.

### 1.    First Objection

Plaintiff objects to the License Agreement between Golden Boy and Plaintiff on the grounds that it lacks authentication and is irrelevant.    In his declaration, Mr. Giagliardi, Plaintiff's president, properly authenticates the License Agreement. (*See* Giagliardi Decl. ¶ 10 ("The contract attached as Exhibit '1' . . . is a true and accurate representation of the original contract that I signed with Golden Boy . . . .").)   This License Agreement is relevant to substantive claims asserted in Plaintiff's complaint as it bears on whether Plaintiff had the rights to the commercial distribution of the Boxing Program.  Plaintiff's first objection is OVERRULED.

1

## 2.   Second Objection

2      Plaintiff objects to the April 2005 affidavit of Plaintiff's
3  private investigator, Calvin Stanfield, as lacking authentication
4  and irrelevant.   Mr. Stanfield's affidavit is notarized and is
5  self-authenticating. *See* Fed. R. Evid. 902(8) ("Documents
6  accompanied by a certificate of acknowledgment executed in the
7  manner provided by law by a notary public or other officer
8  authorized by law to take acknowledgments" are self-
9  authenticating). Mr. Stanfield's declaration based on his personal
10  knowledge and observations is relevant to show Defendant's
11  broadcast of the Boxing Program to patrons.   It is also relevant to
12  whether the broadcast was for commercial advantage or financial
13  gain, as Mr. Stanfield discusses "Posters" he observed which
14  advertised the fight and the "cover charge" he claims to have paid
15  to enter Frankie's. (Doc. 16-2, Ex. 2 at 1.)   While there are
16  attachments to his affidavit that may not be particularly
17  meaningful, such as pictures of the sign to "Frankie's" and
18  vehicles parked outside the establishment, the pertinent
19  substantive provisions of Mr. Stanfield's affidavit (e.g., his
20  viewing of fight, the "Posters," the "cover charge," etc.) are
21  relevant for the purposes for which his affidavit was submitted.
22  Defendant's second objection is OVERRULED.

23      ## 3.   Third Objection

24      Defendant objects to Plaintiff's submission (Pl.'s Mem. of P.
25  & A., Ex. 3) of the Comcast account statement which shows the
26  $39.99 charge for the Boxing Program.   Defendant argues that the
27  account statement lacks authenticity.   This objection is frivolous.

28

Defendant included the *same* Comcast account statement in its own submissions, acknowledging the authenticity of the document.   In addition, a declaration from Thomas P. Riley authenticates the Comcast account statement. (Riley Decl. ¶ 3.)   Defendant's third objection is OVERRULED.

**4.   Fourth And Fifth Objection**

Defendant objects to Plaintiff's requests for admissions and Defendant's own signed discovery responses, i.e., Defendant's answers to the requests for admissions, both of which Plaintiff has submitted.   Defendant argues that the requests for admissions and Defendant's answers lack authenticity.   The Riley declaration authenticates the discovery requests and answers. (*See* Riley Decl. ¶¶ 4-5.)   The fourth and fifth objections are OVERRULED.

**5.   The Sixth Through Ninth Objections**

Finally, Defendant objects to the sentences that Plaintiff used in its Statement of Undisputed Material Facts in support of Plaintiff's motion for summary judgment/adjudication.   For example, Plaintiff's first statement of Undisputed Material Fact reads: "A Championship Boxing *Program* was televised on Saturday, April 09, 2005."   Defendant objects to this statement on the ground that it is "vague" because the statement does not specify to which Championship Boxing Program the writer is referring.   This objection, like the rest of the objections to Plaintiff's Statement of Undisputed Material Facts, is moot in light of the ruling on Plaintiff's motion.   Even taking Plaintiff's statements of undisputed material facts as they are worded, Plaintiff has not demonstrated that summary judgment/adjudication in its favor is

1  warranted.  At this juncture, there is no need to analyze whether

2  the Statement of Undisputed Material Facts was phrased properly.

3  Defendant's objections to the phrasing or form of Plaintiff's

4  statements of undisputed material facts are OVERRULED.

V.   CONCLUSION

6      For the reasons stated:

7      1.   Plaintiff's and Defendant's cross-motions for summary

8  judgment/adjudication are DENIED; and

9      2.   Defendant's evidentiary objections are OVERRULED without

10  prejudice.

11      Defendant shall submit a form of order consistent with, and

12  within five (5) days following electronic service of, this

13  Memorandum Decision.

IT IS SO ORDERED.

Dated:   November 5, 2009           /s/ Oliver W. Wanger
                              UNITED STATES DISTRICT JUDGE

28